**COLE SCHOTZ P.C.**
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
Daniel F. X. Geoghan
Cameron A. Welch
Mark Tsukerman
*Counsel to Drivetrain, LLC, in its capacity as*
*Trustee of the SunEdison Litigation Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SUNEDISON, INC., *et al.*, | Case No. 16-10992 (DSJ) |
| Reorganized Debtors. | (Jointly Administered) |
| DRIVETRAIN, LLC, IN ITS CAPACITY AS TRUSTEE OF THE SUNEDISON LITIGATION TRUST, | Adv. Pro. No. 19-01110 (DSJ) |
| Plaintiff, | |
| – against – | |
| EXPEDITORS INTERNATIONAL, EXPEDITORS INTERNATIONAL INC., EXPEDITORS INTERNATIONAL OF WASHINGTON, INC., AND EXPEDITORS INTERNATIONAL (UK) LTD., | |
| Defendants. | |

**NOTICE OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**
**AS TO DEFENDANTS' "TIME-BAR DEFENSE"**

**PLEASE TAKE NOTICE** that the SunEdison Litigation Trust (the "**Trust**" or

"**Plaintiff**"), plaintiff in the above-captioned adversary proceed, hereby files the *Plaintiff's*

*Cross-Motion for Summary Judgment as to Defendants' "Time-Bar Defense"* (the "**Cross -**

**Motion**").

57533/0006-52965381v1

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "**Hearing**") on the Motion will be held before the Honorable David S. Jones, United States Bankruptcy Judge for the Southern District of New York, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 501, New York, New York 10004 (the "**Bankruptcy Court**"). The Hearing will be held on a date to be scheduled with the Court.

Dated: New York, New York
     April 17, 2026

COLE SCHOTZ P.C.

*/s/ Mark Tsukerman*
Daniel F. X. Geoghan
Cameron A. Welch
Mark Tsukerman
Arielle H. Wasserman
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000

*Counsel to Drivetrain, LLC, in its capacity as Trustee of the SunEdison Litigation Trust*

2

57533/0006-52965381v1

**COLE SCHOTZ P.C.**
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
Daniel F. X. Geoghan
Cameron A. Welch
Mark Tsukerman
*Counsel to Drivetrain, LLC, in its capacity as*
*Trustee of the SunEdison Litigation Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SUNEDISON, INC., *et al.,*<br><br>    Reorganized Debtors. | Chapter 11<br><br>Case No. 16-10992 (DSJ)<br><br>(Jointly Administered) |
| DRIVETRAIN, LLC, IN ITS CAPACITY AS TRUSTEE OF THE SUNEDISON LITIGATION TRUST,<br><br>    Plaintiff,<br><br>  – against –<br><br>EXPEDITORS INTERNATIONAL, EXPEDITORS INTERNATIONAL INC., EXPEDITORS INTERNATIONAL OF WASHINGTON, INC., AND EXPEDITORS INTERNATIONAL (UK) LTD.,<br><br>    Defendants. | Adv. Pro. No. 19-01110 (DSJ) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANTS' "TIME-BAR DEFENSE"**

57533/0006-52850461

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

LEGAL ARGUMENT.......................................................................................................... 3

    I.     SUMMARY JUDGMENT STANDARD ............................................................... 3

    II.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT STRIKING
           DEFENDANTS' SECOND AFFIRMATIVE DEFENSE. ................................... 4

           A.    Defendants' Time-Bar Defense is Based on an Undisclosed,
                 Unauthorized, and Invalid Challenge Period Agreement. ......................... 4

                 1.     A Debtor-in-Possession Cannot Agree to Shorten the
                         Statutory Limitations Period for Bringing Chapter 5 Claims
                         Without Appropriate Notice and Court Approval. ....................... 5

                 2.     The Defendants' Time-Bar Defense Runs Afoul the Court's
                         Interim Lien Claimants Order. ........................................................ 9

                 B.    By Its Own Terms, Defendants' Invalid Challenge Period
                 Agreement Does *Not* Bar the Trustee's Claims. ................................... 12

                   1.     Expeditors' Alleged Challenge Period Agreement Only
                         Applies to the Debtors, not the Trustee. ..................................... 12

                   2.     The Trustee's Claims Fall Outside Expeditors' Alleged
                       Challenge Period Agreement. ....................................................... 14

                 C.    Defendants' Equitable Estoppel Argument is Unavailing. ...................... 16

    III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS
           TO THEIR LIEN DEFENSE.............................................................................. 17

           A.    Introduction and Legal Framework for Analyzing Defendants' Lien
                 Defense. ................................................................................................. 17

                   1.     The Section 547(b)(5) Lien Analysis Must Be Performed as
                       of the Petition Date. ...................................................................... 18

                   2.     The Defendants' Lien Analysis Improperly Relies on Third
                       Party Collateral. ............................................................................ 20

                   3.     Defendants' Lien Analysis is Impermissibly Conclusory and
                       Non-Specific. ................................................................................. 21

i

B. Defendants Cannot Establish Their Asserted Warehouse Liens............... 22

1. Defendants Failed to Establish General Warehouse Liens
Against Any Debtor-Payors (Except NVT, LLC). ....................... 22

2. Defendants Failed to Establish Ownership, Quantity, and
Value of the Alleged Warehouse Collateral. ............................... 26

C. Defendants' Cannot Establish Their Asserted Carriers' Liens. ................ 30

1. Defendants Lack Replacement Liens Against NVT Licenses
and SPS. .................................................................................... 30

2. Genuine Material Issues of Fact Exist Regarding Ownership
and Value of the Alleged In-Transit Collateral............................ 33

CONCLUSION................................................................................................................. 35

57533/0006-52850461

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AASI Creditor Liquidating Tr. v. Data Sys. Int'l (In re All American SemiConductor, Inc.)*,
623 B.R. 643 (Bankr. S.D. Fl. 2020) ....................................................................8

*In re Bridge Info. Sys., Inc.*,
293 B.R. 479 (Bankr. E.D. Mo. 2003) ..................................................................6

*Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*,
356 B.R. 327 (Bankr. S.D.N.Y. 2006) .............................................................17, 20

*In re Columbia Sec. Litig.*,
155 F.R.D. 466 (S.D.N.Y. 1994) ..........................................................................4

*In re Corp. Food Mgmt., Inc.*,
223 B.R. 635 (Bankr. E.D.N.Y. 1998).................................................................19

*In re Crystal Apparel, Inc.*,
220 B.R. 816 (Bankr. S.D.N.Y. 1998)................................................................6, 8

*In re Enron Corp.*,
No. 01-16034 (AJG), 2003 WL 1562202 (Bankr. S.D.N.Y. Mar. 21, 2003) ...........5, 6, 16

*Expeditors Int'l of Washington, Inc. v. The Off. Creditors Comm. of CFLC, Inc. (In re CFLC, Inc.)*,
166 F.3d 1012 (9th Cir. 1999)...........................................................................31, 32

*In re Falcon Prods, Inc.*,
381 B.R. 543 (8th Cir. B.A.P. 2008)....................................................................19

*Friedman v. Meyers*,
482 F.2d 435 (2d Cir. 1973).............................................................................3, 4

*In re Glob. Indus. Techs., Inc. v. Ash Trucking Co. (In re Glob. Indus. Techs., Inc.)*,
333 B.R. 251 (Bankr. W.D. Pa. 2005) ...................................................................8

*Hasset v. Goetzmann (In re CIS Corp.)*,
195 B.R. 251 (Bankr. S.D.N.Y. 1996)..................................................................19

*Heyman v. Commerce and Industry Insurance Co.*,
524 F.2d 1317 (2d Cir. 1975)...............................................................................4

57533/0006-52850461

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007)...........................................................................................7

*Itzhak v. Kahlon (In re Itzhak)*,
674 B.R. 460 (Bankr. S.D.N.Y. 2025)............................................................................19

*In re Jewish Hosp. and Med. Ctr. of Brooklyn*,
90 B.R 45 (Bankr. E.D.N.Y. 1988).................................................................................8

*John Wiley & Sons, Inc. v. DRK Photo*,
998 F. Supp.2d 262 (S.D.N.Y. 2014), *aff'd*, 882 F.3d 394 (2d Cir. 2018) ...............................27

*In re Lavigne*,
114 F.3d 379 (2d Cir. 1997)........................................................................................5, 6

*McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*,
185 B.R. 103 (Bankr. E.D.N.Y. 1995)...........................................................................19

*M.A. on behalf of H.R. v. Rockland Cnty. Dep't of Health*,
53 F.4th 29 (2d Cir. 2022) ...........................................................................................3

*Palmer Clay Prods. Co. v. Brown*,
297 U.S. 227 (1936).................................................................................................18, 19

*In re Patriot Place, Ltd.*,
486 B.R. 773 (Bankr. W.D. Tex. 2013)...........................................................................5

*Pearlstein v. BlackBerry Ltd.*,
No. 13CIV7060CMKHP, 2022 WL 19792 (S.D.N.Y. Jan. 3, 2022) ......................................3

*Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.)*,
380 B.R. 324 (Bankr. S.D.N.Y. 2008)...........................................................................19

*In re Siena Publishers Assocs.*,
149 B.R. 359 (Bankr. S.D.N.Y. 1993)...........................................................................26

*U.S. v. GMI USA Corp.*,
774 F. Supp. 3d 645 (S.D.N.Y. 2025)...........................................................................27

*In re Zarro*,
268 B.R. 715 (Bankr. S.D.N.Y. 2001)...........................................................................17

iv

## **PRELIMINARY STATEMENT**

Pursuant to the parties' *Stipulation and Order Regarding Certain Uncontested Facts and Issues* [Adv. Docket No. 52] (the "**Stipulation**"), Expeditors International of Washington, Inc. ("**EIW**") and Expeditors International (UK) Ltd. ("**Expeditors UK**," and together with EIW, "**Defendants**") have filed a motion (the "**Motion**")[1] for summary judgment as to two defenses: (1) Defendant's Second Affirmative Defense that the claims in this adversary proceeding are time-barred as a result of Expeditors' alleged "challenge period" agreement with the Debtors in an April 29, 2016 email exchange (the "**April 29th Email**") (*see* Stipulation at ¶ 9), (the "**Time-Bar Defense**"); and (2) that the Defendants were fully secured against the assets of the relevant transferor and, therefore, Drivetrain, LLC, in its capacity as Trustee ("**Plaintiff**" or "**Trustee**") of the SunEdison Litigation Trust ("**Trust**"), cannot satisfy the elements of section 547(b)(5) of the Bankruptcy Code (the "**Lien Defense**").

Plaintiff opposes the Motion and cross-moves for summary judgment striking the Time-Bar Defense. Expeditors' Time-Bar Defense is meritless for two principal reasons. *First*, the defense is premised on an undisclosed, unauthorized, and invalid "challenge period agreement". The Debtors lacked authority to stipulate to a limited challenge period to bring avoidance actions against Expeditors without Court approval upon appropriate notice, which neither the Debtors nor Expeditors sought or were granted. *Second*, even assuming, *arguendo*, that the undisclosed challenge period agreement was enforceable, the alleged agreement does **not**, by its own terms, preclude the Trustee from bringing the claims against Expeditors in these proceedings because: (a) it would only apply the Debtors, not the Trustee; and (b) the Trustee's claims against Expeditors

---

[1] Citations to the Motion shall refer to *Defendants' Memorandum of Law in Support of Motion for Summary Judgment, or in the Alternative, For Partial Summary Judgment* [Docket No. 56].

would not fall within the purview of the alleged agreement. Accordingly, Plaintiff's cross-motion should be granted.

In support of Plaintiff's opposition to Defendants' Motion as to their Lien Defense, Plaintiff submits the Declaration of Alex Canale (the "**Canale Dec.**") and the Declaration of Cameron Welch (the "**Welch Dec.**"), which are filed contemporaneously herewith. As demonstrated below and in the Canale Dec., the Defendants' Lien Defense presents extraordinarily fact-intensive issues, which are subject to material disputes and remain unfit for summary judgment. Material factual disputes exist with respect to, among other things, (a) the factual predicates for Defendants' asserted general warehouse liens as to all the Payor-Debtors[2] other than NVT, LLC ("**NVT**"); (b) assuming the Defendants lack general warehouse liens for all Payor-Debtors other than NVT, the factual predicates for Defendants' asserted specific warehouse liens; (c) the factual predicates for Defendants' asserted replacement carrier's liens as to NVT Licenses, LLC ("**NVT Licenses**") and SunEdison Products Singapore PTE. Ltd. ("**SPS**"); (d) assuming the Defendants lack replacement carrier's liens for NVT Licenses and SPS, the factual predicates for Defendants' asserted specific statutory carrier's liens; (e) whether each of the Payor-Debtors actually owned the inventory/collateral that the Defendants attribute to them in their collateral coverage position, which, in various respects contradicts the Debtors' records and implicates an extremely fact-intensive documentary analysis that is completely missing from the Defendants' collateral coverage analysis; and (f) aside from ownership, the quantity and value of the Defendants' alleged collateral. Given all the foregoing disputes of material facts, and others, the Defendants are not entitled to summary judgment on their Lien Defense.

---

[2] "Payor-Debtors" refers to MEMC Pasadena, Inc., NVT, LLC, NVT Licenses, LLC, PVT Solar, Inc. d/b/a EchoFirst Inc., Solaicx, SunEdison Inc., and SunEdison Products Singapore Pte. Ltd.

2

**STATEMENT OF FACTS**

Plaintiff incorporates by reference its *Plaintiff's Statement of Undisputed Material Facts in Support of its Cross Motion and Response to Expeditors' Statement of Undisputed Material Facts* ("**Plaintiff's SOMF**"), together with the exhibits referenced therein.

**LEGAL ARGUMENT**

**I.      SUMMARY JUDGMENT STANDARD**

Rule 56(c) of the Federal Rules of Civil Procedure (the "**Civil Rules**"), made applicable herein by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), states, in pertinent part, that a judgment favorable to the movant "shall be rendered" if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). Under this standard, where the facts, as presented in the pleading, affidavits and other materials ***are so forcefully homogeneous*** that there are no facts left in dispute, summary judgment is appropriate.  However, absent such consonance of material facts, summary judgment is inappropriate. *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir. 1973).

Summary judgment on fact intensive issues is improper. *See M.A. on behalf of H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 37 (2d Cir. 2022) ("Given the fact-intensive nature of this inquiry, Defendants have not met the high bar required to prevail at the summary-judgment stage."); *Pearlstein v. BlackBerry Ltd.,* No. 13CIV7060CMKHP, 2022 WL 19792, at *9 (S.D.N.Y. Jan. 3, 2022) ("Such fact-intensive inquiries are always reserved for the jury"); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) ("resolving ... a fact-intensive inquiry is not appropriate at the summary judgment stage").  Where doubts exist concerning material facts, the court must favor the party adverse to the motion for summary judgment. *Friedman,* 482 F.2d 435, 439; *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320-1321 (2d Cir. 1975).

3

## II. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT STRIKING DEFENDANTS' SECOND AFFIRMATIVE DEFENSE.

### A. Defendants' Time-Bar Defense is Based on an Undisclosed, Unauthorized, and Invalid Challenge Period Agreement.

Defendants' Time-Bar Defense is premised on the untenable argument that chapter 11 debtors may secretly agree to a "challenge period" (*i.e.*, an agreement to shorten the statutory limitations period) for bringing avoidance claims under chapter 5 of the Bankruptcy Code without providing notice to creditors and obtaining court approval.

Defendants contend that their undisclosed challenge period agreement was authorized under the Court's Interim Lien Claimants' Order.[3] They refer to it as a "Trade Terms Agreement" (which, as explained below, is a misnomer) in a desperate, yet unconvincing, attempt to square the alleged agreement with the terms of the Interim Lien Claimants Order. But Defendants are trying to fit a square peg into a round hole. The alleged challenge period agreement has nothing to do with "trade terms" and clearly is not authorized by the Court's Interim Lien Claimants Order. Implicitly recognizing this fatal flaw, Defendants now submit that a chapter 11 debtor may covertly agree to a challenge period for bringing chapter 5 claims against a creditor, without approval and notice to other creditors, pursuant to the debtor's authority to operate in the ordinary course of business under section 363(c)(1) of the Bankruptcy Code. In other words, according to Defendants, a chapter 11 debtor may, without any notice, disclosure, or court oversight, enter into agreements with creditors that shorten the two-year limitations period for bringing avoidance actions prescribed under section 546(a) of the Bankruptcy Code.

Defendants' argument is contrary to fundamental bankruptcy law.

---

[3] Capitalized terms used but not defined herein have the meanings assigned to them in Plaintiff's SOMF.

**1.    A Debtor-in-Possession Cannot Agree to Shorten the Statutory Limitations Period for Bringing Chapter 5 Claims Without Appropriate Notice <u>and Court Approval.</u>**

It is fundamental bankruptcy law that a chapter 11 debtor cannot enter into postpetition transactions outside of the ordinary course of business without court approval, upon appropriate notice, *see* 11 U.S.C. § 363(b), and that postpetition compromises of estate claims require court approval upon notice to all creditors. *See* Fed. R. Bankr. P. 9019(a), 2002(a) (requiring at least 21 days' notice of, among other things, any proposed use of estate property outside the ordinary course of business and hearings to approve a compromise or settlement). Consequently, a "transaction by a Chapter 11 debtor that is outside the ordinary course of its business and lacks court approval is unenforceable, ineffective, and void." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013); *see also In re Lavigne*, 114 F.3d 379, 385 (2d Cir. 1997) (holding that the postpetition cancellation of an insurance policy was void because the debtor never provided notice under section 363(b)(1)); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *16 (Bankr. S.D.N.Y. Mar. 21, 2003) ("Absent notice and an opportunity for a hearing, non-ordinary course of business transactions are void.").

"Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets." *In re Lavigne*, 114 F.3d 379, 384. "Typically courts examine the 'horizontal' and 'vertical' dimensions of a debtor's business to address these policies reflected in the Code and to determine whether a transaction is outside the ordinary course of business." *In re Crystal Apparel, Inc.*, 220 B.R. 816, 831 (Bankr. S.D.N.Y. 1998) (citing *Lavigne*, 114 F.3d at 385). "[I]f either dimension of the test is not satisfied, the disputed transaction is not in the ordinary course of business." *Id.*

57533/0006-52850461

"The horizontal analysis is an external industry-wide comparison of the debtor's business and other like businesses to see if the transaction is ordinary for this type of business." *Id.* The vertical dimension "analyzes whether interested parties would reasonably expect the particular debtor in possession to seek court approval before entering into the questioned transaction." *In re Bridge Info. Sys., Inc.*, 293 B.R. 479, 486 (Bankr. E.D. Mo. 2003) (citing *Crystal Apparel, Inc.*, 220 B.R. at 832). "The touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *Lavigne*, 114 F.3d at 384-85 (internal quotations and citations omitted).

A postpetition agreement by a chapter 11 debtor disposing of estate claims under chapter 5 of the Bankruptcy Code—including one that abridges the statutory limitations period for bringing them—cannot pass either test for ordinariness. It is widely known and understood that a chapter 11 debtor must obtain court approval of any settlement or compromise of estate avoidance actions under Bankruptcy Rule 9019. *See, e.g.*, *In re Bridge Information Sys., Inc.*, 293 B.R. 479 (Bankr. E.D. Mo. 2003) (holding that the debtor's unapproved settlement of avoidance claims does not pass the vertical test and, therefore, was unenforceable). The latter proposition applies with equal, if not greater, force to an agreement that purports to shorten the limitation periods for estate avoidance claims, which is functionally equivalent to compromising the claims themselves and can significantly dissipate estate assets. *See In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *18 (Bankr. S.D.N.Y. Mar. 21, 2003) ("Protection against the dissipation of assets is one of the fundamental policies underlying section 363(c)(1)."); *cf. In re Iridium Operating LLC*, 478 F.3d 452, 461 (2d Cir. 2007) ("Bankruptcy Rule 9019 … has a clear purpose to prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court.") (internal quotations and ellipses omitted). Challenge period provisions are routinely

6

included in DIP financing and/or cash collateral stipulations and, given their extraordinary nature and potential deleterious impact on the estate, both the national and local bankruptcy rules require them to be prominently disclosed in a motion and approved by the court. *See, e.g.*, Fed. R. Bankr. P. 4001(c)(1)(viii) (requiring specific disclosure of any "release, waiver, or limitation on a claim or other causes of action belonging to the estate or the trustee, ***including any modification of the statute of limitations or other deadline to commence an action***") (emphasis added); SDNY Local Bankruptcy Rule 4001-2(a)(8), (a)(12), and (a)(21) (requiring prominent disclosure of any provision [including a detailed explanation] providing for an investigation period).

Thus, given the requirements of the Bankruptcy Code and Rules, no creditor could or should reasonably expect that a chapter 11 debtor can agree to shorten the limitations period for bringing chapter 5 causes of action without providing appropriate notice to creditors and obtaining court approval – *i.e.*, it fails the vertical test. Furthermore, while it may be "ordinary" for companies outside of bankruptcy to enter into agreements shortening limitations periods for prepetition claims, bankruptcy claims are different. They do not exist until a debtor commences bankruptcy and then are owned by the debtor's bankruptcy estate (not the prepetition debtor). Thus, there can be no industry standard for the disposition of avoidance actions outside of bankruptcy (the claims don't exist outside of bankruptcy) and, within bankruptcy, it is absolutely not industry standard (in fact, it is unheard of) for chapter 11 debtors to execute undisclosed agreements with their creditors curtailing the section 546 limitations period for bringing avoidance actions absent court approval. *Cf. Crystal Apparel, Inc.*, 220 B.R. at 832 ("Even if this court accepts the premise that 'golden parachutes' are common outside of bankruptcy in the apparel industry, that does not mandate the conclusion that entering into a contract providing for such a payment is in the ordinary course of business for a Chapter 11 retail debtor. If that were so, nothing

7

would seem to be out of the ordinary course of business in a chapter 11 case…. The creditors and any committees are entitled to scrutinize such agreements before they become binding."). Thus, Expeditors' so-called "challenge period agreement" also fails the horizontal test.

Defendants argue that "[n]othing in the Bankruptcy Code or other federal law limits the ability of a debtor-in-possession to agree to shorten the limitation period for asserting chapter 5 claims." (Motion at p. 9). Yet, Defendants fail to mention any of the foregoing legal authorities and cite only to three cases in support of their argument, each of which is wholly inapposite. First, *In re Jewish Hosp. and Med. Ctr. of Brooklyn*, 90 B.R 45 (Bankr. E.D.N.Y. 1988) is a case filed under the Bankruptcy Act, in which *the court approved* a post-petition agreement between the debtor (a hospital) and United States Department of Health and Human Services ("DHH") requiring the debtor to bring any claims against the DHH by a date certain. The case is obviously distinguishable by the fact that the agreement at issue was approved by the court, among other reasons. Next, in *AASI Creditor Liquidating Tr. v. Data Sys. Int'l (In re All American SemiConductor, Inc.)*, 623 B.R. 643 (Bankr. S.D. Fl. 2020) the court dismissed the litigation trust's complaint because the contractual limitations period applicable to the debtor's state law claims had already expired prior to the petition date. The case did not involve any postpetition challenge period agreement (or any postpetition agreement at all for that matter). Finally, *In re Glob. Indus. Techs., Inc. v. Ash Trucking Co. (In re Glob. Indus. Techs., Inc.)*, 333 B.R. 251 (Bankr. W.D. Pa. 2005) did not even involve estate claims. Rather, the court granted the debtors' objection to a creditor's unliquidated, unsecured, prepetition claims against the debtors' estates as barred under the applicable contractual and statutory limitations period. Thus, not surprisingly, the Defendants have failed to provide the court with a single case that supports their Time Bar Defense.

57533/0006-52850461

Thus, Expeditors' alleged challenge period agreement with the Debtors constitutes a non-ordinary-course post-petition transaction limiting estate causes of action under chapter 5 of the Bankruptcy Code, which cannot be effectuated without appropriate notice and Court approval.

### 2. The Defendants' Time-Bar Defense Runs Afoul the Court's Interim Lien Claimants Order.

As a non-ordinary transaction, Defendants' alleged challenge period agreement is invalid and unenforceable absent Court approval, upon appropriate notice to creditors. Contrary to Expeditors' arguments, the Interim Lien Claimants Order fails to supply the requisite authority for its secret and invalid alleged challenge period agreement with Debtors.

First and foremost, there is absolutely nothing in the Interim Lien Claimants Motion, the Interim Lien Claimants Order, or the Final Lien Claimants Order that remotely speaks to or purports to authorize the Debtors to compromise their rights under the Bankruptcy Code and enter into agreements with Lien Claimants shortening the statutory limitations period for chapter 5 avoidance actions. (*See* Exs. C, D, E to Kresge Dec.). Grasping at straws, Defendants point to paragraph 4 of the Interim Lien Claimants Order as the sole support for their Time-Bar Defense. That paragraph states that "[t]he Debtors may, in their sole discretion, condition payment of any Lien Claimant on the written agreement of such Lien Claimant to continue to supply goods and services to the Debtors on the *Agreed Terms*." (Ex. D to Kresge Dec. at ¶ 4). (emphasis added). "Agreed Terms" is defined in the Lien Claimants Motion as:

> i) the most favorable trade terms, practices, and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, and other applicable terms and programs), in effect between the Lien Claimant and the Debtors during the 180 days preceding the Petition Date, or (ii) *such other favorable trade terms as the Debtors and the Lien Claimant may mutually agree upon*.

(Ex. D to Kresge Dec. at ¶ 23) (emphasis added).

9

57533/0006-52850461

Defendants' attempt to couch their challenge period agreement as a "trade term" under the above-cited provision fails for at least three reasons. ***First***, Paragraph 4 authorizes the Debtors to "condition payment of any Lien Claimant" on the Lien Claimant's commitment to supply goods and services on "Agreed Terms." (Ex. D to Kresge Dec. at ¶ 4). It is, thus, a tool for the Debtors to obtain favorable credit terms (consistent with the definition of Agreed Terms) from Lien Claimants in exchange for the payment of the Lien Claimant's prepetition claim. This cannot reasonably be construed as authorizing the Debtors to abridge or compromise any of their claims relative to the Lien Claimant, which is neither a trade term nor favorable to the Debtors. *Id.*

***Second***, to the extent there is any doubt regarding the scope of the Debtors' authority, the Interim Claimants Order expressly forbade the Debtors from taking any action waiving the Debtors' rights and claims relative to the Lien Claimant, under the Bankruptcy Code or any other applicable law. For example, paragraph 7 of the Interim Lien Claimants Order provides:

> Neither the Debtors nor any other party in interest concedes that any Liens (contractual, common law, statutory or otherwise) satisfied pursuant to this Order are valid, and notwithstanding anything herein, ***or any action that the Debtors may take in connection with the relief granted herein, . . . the Debtors do not waive any and all of their rights to challenge the extent, validity, perfection or possible avoidance of the related Liens and payments.*** (Emphasis added)

(Ex. D to Kresge Dec. at ¶ 7). Similarly, paragraph 11 of the Interim Lien Claimants Order provides: "Notwithstanding the relief granted in this Order *and any actions taken pursuant to such relief*, nothing in this Order shall be deemed … *a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law*." (*Id.* at ¶ 11). Thus, it is clear that while the Debtors' had some discretion under the Interim Lien Claimants Order to negotiate "Agreed Terms," they lacked any discretion or authority to waive any of their rights and claims against the Lien Claimant and under the Bankruptcy Code, nor could they even concede on behalf of the estate that any of the Liens satisfied pursuant to the Interim Lien Claimants Order were valid. *A fortiori*,

10

the Debtors could not enter into an undisclosed challenge period agreement limiting their rights to bring avoidance claims against a Lien Claimant.

*Finally,* the April 29th Email itself evidences that the parties' alleged challenge period agreement had nothing to do with the "Agreed Terms." In the April 29th Email, Defendants' counsel requested confirmation of the parties' agreement to both "adequate protection terms" and "post-petition trade terms" as set forth in the email. (*See* Ex. A to Powell Dec.). The "post-petition trade terms" were explicitly addressed in paragraph 3 of counsel's emails, which stated:

> Exercising their authority under the lien claimants order, ***the debtors agree to the following post-petition trade terms in lieu of the "Agreed Terms" referred to in paragraph 4 of the lien claimants orders***:
>
> a) Post-petition services by Expeditors are provided under the applicable contract of carriage or storage, including Expeditors' ocean bill of lading, air waybill, forwarder's cargo receipt, truck bill of lading, terms and conditions of services, and customs power of attorney.
>
> b) The debtors shall pay Expeditors' invoices according to the pre-petition contractual trade terms between the parties.
>
> c) Expeditors may cease performing services if a debtor defaults on any of its obligations to Expeditors.
>
> d) Expeditors' liens shall be determined in accordance with non-bankruptcy law.

(*Id.*) (emphasis added). By its own terms, paragraph 3 represents the entirety of the "Trade Term Agreement," *i.e.*, the "Agreed Terms" allowed by the Interim Lien Claimants Order.

The alleged challenge period agreement, however, is set forth in its own separate stand-alone paragraph of the April 29th Email – paragraph 5 – that does not refer to the Interim Lien Claimants Order or any trade terms, but evidently related to the "adequate protection terms" referenced by counsel in the introductory sentence of his email. (*Id.*) Indeed, a challenge (or investigation) period is a term typically addressed in connection with cash collateral and DIP financing stipulations (such as the Interim DIP Order in this case (*see* Ex. B to Welch Dec.)), dealing with adequate protection terms relative to the liens and claims of a debtor's secured

11

lenders.  By its very terms, the April 29th Email is an undisclosed and unauthorized adequate protection stipulation.

At bottom, the Defendants' Time-Bar Defense is premised upon the enforcement of the parties' alleged challenge period agreement, which was an out-of-the-ordinary course transaction and compromise concerning chapter 5 claims that required appropriate notice to all parties-in-interest and Court approval pursuant Bankruptcy Code section 363 and Bankruptcy Rule 9019. The Debtors and Expeditors never provided the requisite notice or obtained the necessary Court approval and, thus, their concealed adequate protection agreement is a legal nullity.

### B. By Its Own Terms, Defendants' Invalid Challenge Period Agreement Does *Not* Bar the Trustee's Claims.

Even assuming, *arguendo*, that Expeditors' challenge period agreement with the Debtors is valid and enforceable, the "agreement," by its own terms, does not bar the Trustee's claims against Expeditors for two independent reasons:  (a) the agreement only purports to apply to and bind the Debtors, not the Trust, which acquired the Debtors' chapter 5 claims "free and clear" under the Plan and Confirmation Order; and (b) given its context, the agreement should appropriately be interpreted to cover only challenges and chapter 5 claims relating to Expeditors' asserted prepetition claims and liens, not unrelated avoidance actions.

#### 1. Expeditors' Alleged Challenge Period Agreement Only Applies to the Debtors, not the Trustee.

Paragraph 5 of the April 29th Email reads as follows:

> ***The debtors agree that any challenge <u>by the debtors</u>*** to the validity, extent, perfection or priority of Expeditors' pre-petition claims or liens or any claim against Expeditors under Chapter 5 of the bankruptcy code must be made within 120 days after the date of this letter agreement.  ***If no such challenge is made, the debtors stipulate that Expeditors' pre-petition claims are allowed as secured claims.***

(Ex. A to Powell Dec.). (emphasis added).

12

57533/0006-52850461

By its express terms, paragraph 5 is limited to challenges and claims made *by the Debtors*. As the Defendants allege, *the Debtors* did *not* commence chapter 5 claims against the Defendants within the referenced 120-day period (*see* Defendants' *Statement of Undisputed Material Facts Pursuant to Federal Bankruptcy Rule 7056* ("**Def's SOMF**") ¶ 16). Thus, Debtors fully complied with the terms of their "agreement" with Expeditors. The Trust, however, is not the Debtors, nor is the Trust a successor to the Debtors as the Defendants incorrectly contend.

The Debtors' Plan was a plan of reorganization, not liquidation. In this regard, the Plan provided for the continued existence and operation of the Debtors after the Effective Date, as Reorganized Debtors (*see, e.g.*, Ex. C to Welch Dec. at §§ 1.197, 6.14), and separately provided for the formation, establishment and governance of the GUC/Litigation Trust on the Effective Date pursuant to the GUC/Litigation Trust Agreement. (*Id.* at §§ 1.115, 7.1). The Plan disposed of the assets of the Debtors' estates as between the Reorganized Debtors and the GUC/Litigation Trust. The Plan provided, essentially, that the Reorganized Debtors would retain any assets that were not transferred "free and clear" to the GUC/Litigation Trust. (*See, e.g.*, *Id.* at §§ 6.20, 11.1). The Plan provided for the "free and clear" transfer of the "GUC/Litigation Trust Assets" to the GUC/Litigation Trust, and consistently, the Confirmation Order provides that "[o]n the Effective Date . . . , the GUC/Litigation Trust Assets shall be transferred by the Debtors (and deemed transferred) to the GUC/Litigation Trust *free and clear of all Claims, Liens, charges, encumbrances, rights, and interests*…." (Ex. D to Welch Dec. at ¶ 13). The GUC/Litigation Trust Assets were comprised of, among other things, the "GUC/Litigation Trust Causes of Action," (Ex. C to Welch Dec. at §§ 1.117, 7.5), which included all "Estate Avoidance Actions . . . as described in <u>Exhibit 7.6</u> [to the Plan]." (*Id.* at §§ 1.119; 7.6). And notably, Exhibit 7.6 to the Plan expressly

13

identifies Expeditors as a target for avoidance actions, *yet Expeditors never objected to the Plan in this regard even though it was confirmed well after the expiration of the challenge period.*

The Trustee is *not* the Debtors' successor (that would be the Reorganized Debtors), but rather is the assignee of the Debtors' avoidance actions, which were transferred to it "free and clear" of all "all Claims, Liens, charges, encumbrances, rights, and interests." Even assuming, *arguendo*, the challenge period agreement is valid and enforceable (which it is not), the Debtors' chapter 5 claims against Expeditors (which were never waived or released)[4] were duly transferred to the Trust "free and clear" of all liens, claims, encumbrances, and interests.  Moreover, unlike typical challenge period provisions found in cash collateral and DIP financing stipulations (such as the Debtor stipulations and investigation period in the Interim DIP Order in this case), the alleged challenge period agreement only purports to bind "*the Debtors.*" (*See* Ex. A to Powell Dec.). It does not purport to extend to the Trust.  *Cf.* Ex. B to Welch Dec. at ¶ 9 (providing that the Debtors' "Claims Stipulations" and related "Challenge Period" shall be binding on, among others, "the Debtors *and their respective representatives, successors, and assigns*").  That critical language making the challenge period agreement applicable to Debtors' assigns, i.e. the Trust, is entirely absent from Expeditors' alleged challenge period agreement.  Therefore, by its own plain terms, even if valid and enforceable, there is no breach of the alleged challenge period agreement.

### 2.    The Trustee's Claims Fall Outside Expeditors' Alleged Challenge Period Agreement.

Even if the alleged challenge period agreement were valid and enforceable, the Trustee's claims against Expeditors would *still* not be barred for another reason – the agreement does *not* so

---

[4] Expeditors has conceded in no uncertain terms that the alleged April 29th Email agreement did not effectuate any waiver of the Debtors' chapter 5 claims against Expeditors.  (Rule 30(b)(6) deposition transcript of Bradley Powell, dated October 14, 2025, and attached as Ex. F to the Welch Dec. ("Powell Tr.") 247:20 – 249:4).

14

provide.  As Defendants admit, the stipulation does *not* provide for the waiver and/or release of the Debtors' (or its successors and assigns) right to bring chapter 5 avoidance actions against Expeditors (*see supra* at n.2), nor does it state anywhere that chapter 5 claims will be barred:

> Q: Pursuant to your understanding of paragraph 5 of [the April 29th Email], what happens if SunEdison does not assert a claim under Chapter 5 of the Bankruptcy Code within 120 days after the date of this letter agreement?
>
> A: ***It's my understanding that the period to make those claims has lapsed, and therefore they are not able to make those claims.***
>
> Q: Where does it say that in paragraph 5? Point me to the language.
>
> A: ***It doesn't say that expressly***.

(Powell Tr., 253: 8-24) (cleaned up and objections omitted) (emphasis added).

In fact, the "agreement" expressly states the consequences of the Debtors' failure to challenge Expeditors' prepetition claims or liens or to bring a chapter 5 claim within 120 days. *To wit*, "***[i]f no such challenge is made, the debtors stipulate that Expeditors' pre-petition claims are allowed as secured claims***." (Ex. A to Powell Dec.). (emphasis added). Thus, there is no express term in the April 29th Email that "bars" the Plaintiff's claims.  The analysis could stop there, but it need not.

The stated consequence of the failure to bring chapter 5 claims within the challenge period is also indicative of meaning of the lead-in sentence.  In full context, the reference to "any claim against Expeditors under Chapter 5 of the bankruptcy code" must, logically, *only* refer to chapter 5 claims that would challenge the validity, extent, perfection or priority of Expeditors' pre-petition claims or liens – i.e., the actual subject matter of the Lien Claimants Motion and Interim Lien Claimants Order.  There is nothing whatsoever in those filings that addresses or in any way concerns prepetition payments to Expeditors that had already been made (and, thus, were not and

15

could not be part of any outstanding prepetition claim or lien held by Expeditors).[5]

Thus, although unenforceable, the alleged challenge period agreement is, by its own terms, limited to providing for the allowance of Expeditors' prepetition claims as secured claims and does not preclude the Trustee's claims against Expeditors in this matter.

### C.   Defendants' Equitable Estoppel Argument is Unavailing.

Defendants' equitable estoppel argument is misguided and unavailing. As an initial matter, and as discussed above, the alleged challenge period agreement (if enforceable in the first instance) does not, even by its own terms, preclude the Trustee's claims against Expeditors. Thus, there is no misrepresentation that could form a basis for equitable estoppel in the first instance.

Furthermore, the Trustee cannot be "equitably estopped" for refusing to honor an unauthorized and invalid "agreement" under applicable bankruptcy law. The consequences of entering into an unauthorized non-ordinary course agreement with a chapter 11 debtor is well-known and established as a matter of law – the agreement is void. *See In re Enron Corp.*, 2003 WL 1562202, at *16 ("Absent notice and an opportunity for a hearing, non-ordinary course of business transactions are void."). Defendants attempt to invoke equitable principles to circumvent established bankruptcy doctrine and consequences of their own making should be rejected.

Equitable estoppel is also inapplicable because there was no misrepresentation of fact and, to the extent there was, Expeditors certainly did not act reasonably in reliance. The alleged misrepresentation here, according to Expeditors, is presumably Debtors' counsel's "confirming" the April 29th Email. But that is not a factual misrepresentation. And the enforceability of the

---

[5] Had the parties actually intended for the "challenge period" to bar unrelated avoidance actions, the last sentence of paragraph 5 logically and intuitively would have stated so. Presumably, it would have provided something along the lines of: "If no such challenge is made, the debtors stipulate that Expeditors' pre-petition claims are allowed as secured claims *and the Debtors chapter 5 claims against Expeditors shall be waived and released and the Debtors (and their successors and assigns) shall be forever barred bringing them*." But that is not the case here.

16

alleged agreement is a legal issue; equitable estoppel does not apply to alleged misrepresentations of law. *See In re Zarro,* 268 B.R. 715 (Bankr. S.D.N.Y. 2001) (holding that to invoke equitable estoppel under New York law, the "misrepresentation must be one of fact, and an opinion or misrepresentation of law will not suffice."). Expeditors, represented by sophisticated bankruptcy counsel, could not, and certainly should not have, reasonably believed that the Debtors could surreptitiously enter into a "challenge period" agreement without notice to interested parties or court approval. Moreover, Expeditors reviewed the Court's Interim Lien Claimants Order prior to entering into the alleged challenge period agreement. (*See* Ex. A to Powell Dec. at ¶3; Powell Tr., 243:6-10). Thus, Expeditors was aware of its terms and limitations. Expeditors could not reasonably have construed the Interim Lien Claimants Order to permit the Debtors to enter into an "adequate protection stipulation" containing a "challenge period agreement" purportedly limiting the right to assert avoidance actions without notice to creditors. For all the above reasons, and others, Defendants' equitable estoppel argument should be summarily rejected.

### III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO THEIR LIEN DEFENSE.

#### A.   Introduction and Legal Framework for Analyzing Defendants' Lien Defense.

The Lien Defense is based on the principle that, under section 547(b)(5) of the Bankruptcy Code, "a prepetition transfer to a fully secured creditor will not be considered preferential because such creditor would be paid in full in a hypothetical Chapter 7 liquidation as a result of realization on its claim." *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 336 (Bankr. S.D.N.Y. 2006). The logical corollary to this principle is that the creditor's claim must have been secured as against the *debtor's assets*, not the assets of a third party. *See id.*

Here, the Trustee asserts preference claims on behalf of the *non-consolidated* bankruptcy estates of *seven different* Payor-Debtors. Defendants assert fully secured status by virtue of alleged

17

possessory liens on each Payor-Debtor's assets in the form of (a) carrier's liens (including maritime liens and so-called "replacement liens") on the goods it transported, and (b) specific and general statutory warehouse liens on the goods it stored. (*See* Motion at ¶ 3).

To establish their Lien Defense for purposes of summary judgment, the Defendants bear the burden to show, beyond any genuine dispute of material fact, that: (i) as of the relevant time (which, as explained below, is the Petition Date), (ii) they had possession of goods owned by the relevant Payor-Debtor (iii) of a value greater than the alleged preferential transfer amount of such Payor-Debtor, (iv) which gave rise to a valid first priority possessory lien.

The analysis supposedly substantiating the Lien Defense beyond any genuine dispute of material fact is principally set forth in the Declaration of Tracey Hamman [Docket No. 62] (the "**Hamman Declaration**"), wherein Ms. Hamman describes and attaches two "Collateral Coverage Charts" purportedly summarizing Defendants' collateral position relative to their alleged "**Warehouse Collateral**" and "**In-Transit Collateral.**" (Hamman Dec. at ¶¶ 6-7). As demonstrated below, Defendants' lien analysis is replete with legal and factual flaws and discrepancies precluding summary judgment.

### 1. The Section 547(b)(5) Lien Analysis Must Be <u>Performed as of the Petition Date.</u>

Defendants state their alleged collateral position as of both the transfer date (see Hamman Dec. at ¶ 6 and Ex. A) and the petition date (*see id.* at ¶ 9 and Ex. B), but appear to contend that the analysis should be performed as of the transfer date. (*See* Motion at p. 7). To the extent that is Defendants' contention, they are incorrect. The analysis must be performed as of the Petition Date.

The test for section 547(b)(5) was established in the seminal case of *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227 (1936), in which the Supreme Court observed that the preferential effect of the payment must be determined "not by what the situation would have been if the debtor's

18

assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment *as determined when bankruptcy results*." *Id.* at 229 (emphasis added). Thus, under prevailing case law, "the Code § 547(b)(5) analysis is to be made as of the time the Debtor filed its bankruptcy petition." *Hasset v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 262 (Bankr. S.D.N.Y. 1996); *accord In re Falcon Prods, Inc.*, 381 B.R. 543 (8th Cir. B.A.P. 2008); *Itzhak v. Kahlon (In re Itzhak)*, 674 B.R. 460, 474 (Bankr. S.D.N.Y. 2025) (stating that "courts must 'construct a hypothetical chapter 7 case and determine the percentage distribution that the defendant would have received on the *petition date*"); *Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008) (same); *Corp. Food Mgmt., Inc. v. Suffolk Community College (In re Corp. Food Mgmt., Inc.*, 223 B.R. 635, 646 (Bankr. E.D.N.Y. 1998) ("the section 547(b)(5) evaluation is to be made as of the time the debtor filed its bankruptcy petition."); *McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185 B.R. 103,108 (Bankr. E.D.N.Y. 1995) (same, citing numerous cases).[6]

When the analysis is performed as of the Petition Date, as the law requires, even at face value, Defendants' Lien Defense leaves them exposed to $520,791.05 in preference transfers. That is because Defendants admit that, as of the Petition Date, they did not possess any collateral belonging to MEMC Pasadena and Solaicx, and also had insufficient collateral to cover NVT Licenses' transfer by approximately $310,000. With respect to that NVT Licenses transfer,

---

[6] In *Falcon Prods.*, the Eighth Circuit B.A.P. noted a split in the case law regarding whether collateral should be valued as of the date of the transfer(s) or as of the petition date for purposes of the hypothetical liquidation test of section 547(b)(5). 381 B.R. at 546 and n.3 (citing cases). This split, and the limited cases in which courts have utilized the transfer date for purposes of their § 547(b)(5) analysis, generally arise out of insurance premium financing arrangements. *Falcon Prods.* was also an insurance premium finance case, and the Eighth Circuit B.A.P. cogently held that the better reasoned approach, consistent with the language of the statute and Supreme Court precedent, is that secured status must be determined as of the petition date, not the transfer date. *See id.* ("Upon review of the statutory language of § 547(b) and the case law applying it and its predecessor provision in the Bankruptcy Act, the Panel concludes that the hypothetical liquidation test must be conducted as of the petition date.").

57533/0006-52850461

Defendants' Collateral Coverage Chart improperly purports to fill the coverage gap by using "In-Transit Collateral" allegedly belonging to SunEdison, Inc. ("**SUNE**") because SUNE guaranteed NVT Licenses' debts. But that is entirely inappropriate for purposes of a § 547(b)(5) lien analysis and exemplifies another systemic flaw in Defendants' lien analysis – the issue of ownership.

### 2. The Defendants' Lien Analysis Improperly Relies on Third Party Collateral.

Defendants have not identified or established (or even purported to establish) any factual basis for how they assigned collateral they were allegedly holding to the respective Payor-Debtors as reflected in their Collateral Coverage Charts. Moreover, Defendants' lien analysis improperly relies on collateral owned by third parties to reduce their preference exposure.

As discussed above, which Payor-Debtor, if any, owned the inventory/collateral allegedly in Expeditors' possession is *a central element* of their Lien Defense, as it dictates whether Expeditors would have a fully secured claim in *that* particular Payor-Debtor's hypothetical chapter 7 case. This ownership issue was squarely addressed in *Pameco Corp.* There, the debtor was a subcontractor with respect to a construction project owned by a third party. The preference defendant (a supplier) contended that plaintiff could not satisfy § 547(b)(5) because the defendant was fully secured by a construction lien against the premises. *See Pameco Corp.*, 356 B.R. at 332-336. The court soundly rejected the defendant's lien defense, holding that "a prepetition transfer to a creditor that is fully secured by property of a third party in which the debtor holds no interest is subject to avoidance and does not come within the § 547(b)(5) exception." *Id.* at 336. The court explained "the purpose of § 547 is not to establish 'whether a creditor may have recovered all of the monies owed by the debtor *from any source whatsoever,* but instead ... whether the creditor would have received less than a 100% payout in a Chapter 7 liquidation.'" *Id.* (quoting *Smith v. Creative Fin. Mgmt., Inc. (In re Virginia-Carolina Fin. Corp)*, 954 F.2d 193, 198 (4th Cir. 1992)).

20

Defendants not only gloss over this key element of their Lien Defense (*they provide no explanation for how they attributed ownership of the collateral to the various Payor-Debtors*), but apparently assigned collateral to various Payor-Debtors, not based on ownership, but based on whether the Payor-Debtor had any liability to Expeditors with respect to a transaction, and then, apparently, in a way that most favorable distributes the alleged collateral to reduce their preference exposure. Defendants' allocation of collateral they allege belonged to SUNE to reduce their exposure to NVT Licenses' transfer is a prime example of this inappropriate tactic. The same tactic is on full and open display in connection with Defendants' allocation of alleged In-Transit Collateral to either the shipper, consignee, or seller (of their choosing) involved in a freight transaction. And as discussed below, Plaintiff believes that tactic was also employed, though less obviously, in connection with Defendants' attribution of alleged Warehouse Collateral to the Payor-Debtors. Thus, there are very substantial, material factual disputes regarding ownership of the alleged collateral and to which Payor-Debtors, if any, the alleged collateral should be allocated.

### 3. Defendants' Lien Analysis is Impermissibly Conclusory and Non-Specific.

Defendants have not properly discharged the procedural requirements for summary judgment. Under Rule 56, a party asserting that a fact cannot be genuinely disputed for purposes of summary judgment must support the assertion by "citing to particular parts of material in the record[.]" Fed. R. Civ. P. 56(c)(1). As demonstrated in the Canale Dec. and in the discussion below, Defendants have failed to satisfy this requirement. Rather than identifying and citing to "particular parts of material in the record" that would substantiate their Lien Defense, the Defendants essentially bulk cite to their entire document production (over 100,000 documents) and, in conclusory fashion, contend their liens are "abundantly supported" based on all the documents produced. Further to this strategy, the Defendants' Motion consists primarily of broad-

21

based conclusory assertions and surface level analysis.  By doing so, Defendants attempt to create the illusion that their Lien Defense is "open and shut." As demonstrated below, however, when you look under the hood, Defendants' Lien Defense is fraught with complex factual issues, subject to material disputes, that are not appropriate for determination on summary judgment.

Defendants' cursory presentation effectively shifts their summary judgment burden to the Plaintiff, requiring Plaintiff to about two hundred thousand documents for files that the Defendants allege substantiate their asserted liens, but do not actually identify.  However, it is not the Plaintiff that moved for summary judgment as to the disputed section 547(b)(5) issues.  Defendants, as the parties seeking summary judgment, are required to specifically identify the materials in the record that supposedly substantiate their liens such that the Plaintiff (and the Court) may adequately review their claims.  Defendants' blunderbuss and conclusory approach to establishing summary judgment with respect to their highly fact-intensive Lien Defense should be not countenanced.

### B.      Defendants Cannot Establish Their Asserted Warehouse Liens.

#### 1.      Defendants Failed to Establish General Warehouse Liens Against Any Debtor-Payors (Except NVT, LLC).

Defendants' devote what amounts to a single page of their brief to the legal analysis in support of their asserted "warehouse liens". (*See* Motion at p. 19).  But Defendants' understate a complex legal issue.

A warehouse lien is a statutory lien arising under the applicable state law's adaptation of UCC § 7-209.  It is a possessory lien, which means it only applies to goods in possession of the warehouse. *See* UCC § 7-209(e) ("A warehouse loses its lien on any goods that it voluntarily delivers or unjustifiably refuses to deliver").  Unless modified by agreement, a warehouse lien is a "specific lien," which means it only applies to the goods described in a duly issued warehouse

22

receipt and only with respect to the charges incurred for storing such goods. *See* UCC § 7-209(a). The specific warehouse lien is thus lost upon delivery of the goods to the customer, even if the storage charges have not been paid.

Citing to only two paragraphs in their statement of facts (*i.e.*, paragraphs 4 and 18),[7] Defendants state, in conclusory fashion without any factual analysis whatsoever, that "Expeditors engaged in the business of storing goods for Payor-Debtors, and all goods, at all relevant times, were served by general warehouse liens." (Motion at p. 20). Defendants' conclusory assertions regarding their alleged general warehouse liens do not withstand scrutiny.

To start, of all the contracts that Expeditors alleges governed "the transportation, customs brokerage, and warehouse and distributions services" it provided to the Payor-Debtors (Def's SOMF at ¶ 4), there is *only one* that in any way addresses distribution and warehouse services – *i.e.*, Amendment No. 1 to the Logistics Services Agreement between MEMC Electronic Materials, Inc.[8] and Expeditors International of Washington, Inc. (together with all its amendments, the "**LSA**").[9] (*See* Powell Tr., 52:22-53:8 and 183:3-185:17 (testifying that LSA Amendment No. 1 was the only agreement that governed distribution services to SUNE and its subsidiaries)).

---

[7] Def's SOMF at paragraph 4 purports to enumerate the documents that allegedly governed "the transportation, customs brokerage, and warehouse and distributions services that Expeditors provided to the Payor-Debtors[.]" (*Id.* at ¶ 4). Paragraph 18, in turn, states in conclusory fashion: "[as] provided in Expeditors' general terms and conditions of services, applications for credit, and customs powers of attorney in effect before the Petition date, Expeditors had carrier liens, warehouse liens, and replacement liens on its customers' goods in Expeditors' possession, custody or control or in route." (*Id.* at ¶ 18).

[8] On May 30, 2013, MEMC Electronic Materials, Inc. changed its name to SunEdison, Inc. *See* Ex. C to Hamman Dec., Amendment No. 3 to the LSA at ¶ 1.

[9] Paragraph 4(h) of Def's SOMF refers to "Expeditors' distribution terms and conditions for warehouse and distribution services during the period June 1, 2015 to the Petition Date, a true and complete copy of which is attached to the Hamman Declaration as Exhibit H." (Def's SOMF at ¶ 4(h)). That is an *errata*. Defendants likely intended to cite to paragraph 10(i) of the Hamman Declaration, which refers "Exhibits distribution terms and conditions for warehouse and distribution services as contained in the LSA." (Hamman Dec. at ¶ 10(i)). As indicated above, it is undisputed that the only contract produced by Expeditors that purports to govern certain distribution services is reflected in LSA Amendment No. 1.

23

However, the LSA Amendment No. 1 does not, and cannot, support Expeditors' asserted general warehouse liens for several reasons. Most critically, the LSA (including each of its amendments) is executed only by and on behalf of SUNE, on the one hand, and EIW, on the other. It is a two-party agreement.[10]  (*See* Powell Tr. 29:3-6; 51;8-52:21). Logic dictates that a party cannot grant a contractual lien without being party to a contract that purports to grant a lien. At most, the LSA could serve to grant EIW (and only EIW) a lien as against SUNE and its assets, but *not* against the assets of any non-parties (including all the other Payor-Debtors). Further, Expeditors does not allege that it possessed any warehouse liens against SUNE. (*See* Hamman Dec., Exs. A and B). Thus, the LSA (including Amendment No. 1) does not, and cannot, establish Expeditors' alleged general warehouse liens against the relevant Payor-Debtors.[11]

Having established that the relevant Payor-Debtors did not enter into any contract with Expeditors governing Expeditors' provision of warehousing and distribution services, the next question is whether the Defendants identified any contracts in which the relevant Payor-Debtors contractually granted liens to Expeditors to secure Expeditors' warehousing and distribution transactions. To that end, Expeditors identifies and relies on the following documents: (i)

---

[10] Pursuant to the LSA, EIW was agreeing to provide services to SUNE's "agreed subsidiaries and affiliates," but the agreed SUNE subsidiaries and affiliates themselves were not party to the agreement and had no obligations under the agreement. SUNE agreed to be responsible for payment of EIW's services, and EIW was relying on SUNE's credit, as the ultimate parent of all its subsidiaries and affiliates, in connection with its provision of services to SUNE's subsidiaries and affiliates. (*See* Exs. C, I to Hamman Dec).

[11] To the extent the LSA Amendment No. 1 did confer any lien rights and interests to EIW, it did so only with respect to certain limited transactions, reflected in Schedule B1 to the agreement (entitled, "Distribution Scope and Rates"). The Distribution Scope and Rates in Schedule B1 was limited to certain customers (with respect to the Debtor-Payors, only SUNE, NVT, and SPS, but not MEMC Pasadena, NVT Licenses, PVT Solar, or Solaicx) and limited to certain particular warehouse locations, services, and products. For example, the first attachment to Schedule B1 sets forth the terms for distribution services to SUNE, NVT, and SunEdison LLC (SunEdison LLC is not a Payor-Debtor) and only with respect to solar panels at a warehouse location in New Jersey. Thus, even if the LSA Amendment No 1 conferred lien rights as against the assets of other non-party Payor-Debtors (which it did not), Expeditors' conclusory position fails in any way to establish that asserted general warehouse liens related to debts for transactions within the limited scope of the agreement.

24

"Expeditors' general terms and conditions of services" (Defendants' SOMF at ¶ 4(b) (the "**GT&C**"); (ii) certain "Individual Credit Applications" (*id.* at ¶ 4(c)) (the "**Credit Applications**"); (iii) certain Customs Power of Attorney (*id.* at ¶ 4(d)) (the "**Customs P of A**"); and (iv) and certain contracts of carriage (such as airway bills and ocean bills of lading) purportedly governing freight transactions by air, sea, and ground.  (*Id.* at ¶¶ 4(e), 4(f), and 4(g)) (collectively, the "**Contracts of Carriage**").  However, none of those documents support Expeditors' alleged general warehouse liens, except the Credit Applications as to NVT.

Briefly, by its plain terms, the GT&C only purports to grant liens to secure claims "incurred by the Company [*i.e.,* Expeditors] in connection with any ***shipments*** of the Customer [*i.e.*, SunEdison]." (Hamman Dec., Ex. D, GT&Cs at ¶ 15)) (emphasis added).  Thus, to the extent applicable, any liens purportedly granted under the GT&C apply only to freight transactions; they do not extend to unrelated claims arising for warehousing and distribution services.  For even stronger reasons, the same is true for any Contracts of Carriage and Customs P of As, which govern freight transactions, not warehousing and distribution services.  Moreover, there are no lien-granting provisions in the Customs P of As.[12]  Finally, through the Credit Applications, the Payor-Debtors that executed them did grant Expeditors general liens as security for Expeditors' services.  However, only three Debtors ever executed Credit Applications: NVT, Solaicx, and SunEdison LLC.  *See* Ex. E to Hamman Dec.  Expeditors does *not* allege any warehouse liens against Solaicx (*see* Hamman Dec., Exs. A and B), and SunEdison LLC is *not* a Payor-Debtor.[13]

---

[12] As one would expect, through the Customs P of As, each Payor-Debtor that executed the document simply appointed EIW as its customs broker, granting it "power of attorney" to, *inter alia*, act for and on its behalf "in connection with the importation, exportation, transportation, of any merchandise in or through the customs territory, shipped or consigned by or to said grantor."  (Hamman Dec., ¶ 10(e); Ex. E to Welch Dec.).

[13] As discussed below, in support of their "in-transit" collateral position, Defendants assert a "course of performance" theory in an effort to establish contractual replacement carrier's liens as to NVT Licenses and SPS (entities which Expeditors concedes never signed any of the relevant contracts).  Although Defendants have not asserted any such "course of performance" theory in support of their asserted warehouse liens – and Plaintiff reserves

25

57533/0006-52850461

Thus, Expeditors has *not* established that it possessed general warehouse liens against any of the Payor-Debtors against which it asserts warehouse liens, other than NVT. To the extent Expeditors' Lien Defense is premised on warehouse liens as against NVT Licenses, PVT, and SPS, Expeditors can only establish that it held valid statutory warehouse liens by producing the relevant warehouse receipts describing the specific goods in its possession. *See* UCC 7-209(a); *In re Siena Publishers Assocs.*, 149 B.R. 359, 363 (Bankr. S.D.N.Y. 1993) ("A warehouse receipt is a condition precedent to establishing a lien on the goods in the possession of the warehouseman.").

Defendants have failed to identify, describe, or cite to any warehouse receipts in their summary judgment submissions, despite the requirement that they identify the warehouse receipts covering the goods allegedly in their possession to establish their liens. *See id.* Without the corresponding warehouse receipts, Defendants cannot establish a valid warehouse lien, even if they could prove that they had possession of a particular Payor-Debtor's goods. Moreover, given that the Payor-Debtors were afforded credit terms and, according to the Defendants, their invoices were routinely paid late (Powell Tr., 199:6-18), it is extremely doubtful that Defendants maintained any *specific* warehouse liens as of the Petition Date (or even as of the transfer date). By the time the Payor-Debtor made its preferential payment, the *specific* goods that were the subject of that payment had almost certainly left the warehouse long ago.

### 2. Defendants Failed to Establish Ownership, Quantity, and Value of the Alleged Warehouse Collateral.

As indicated above, to establish their Lien Defense, Defendants must demonstrate that they

---

its right to rebut any such contention to the extent asserted for the first time in reply – Plaintiff notes that any such argument would be unavailing. That argument was squarely addressed and rejected by the Ninth Circuit for reasons that are equally applicable here. Also, there is nothing in warehouse invoices that Expeditors issued to the relevant Payor-Debtors that could purport to create a lien in Expeditors favor with respect to its warehouse services.

26

maintained possession of goods belonging to the relevant Payor-Debtor having a value greater than

the amount of the alleged preferential transfer by such Payor-Debtor.  Defendants have failed to

discharge their burden to show which Payor-Debtor owned the alleged collateral on hand, as well

as the quantity and value of such collateral.  According to the Hamman Declaration, the alleged

Warehouse Collateral in the Collateral Coverage Chart is derived from the following documents:

(a) "[t]he data from Expeditors' warehouse management system in use at Expeditors' El Paso, Texas facility (Bates ##EXPD010466)" [14] (hereinafter, "**ELP Warehouse Spreadsheet**") (Hamman Dec. at ¶ 6(e));

(b) "[t]he data from Expeditors warehouse management system in use at Expeditors' other warehouse facilities (Bates ##EXPD010465)"[15] (hereinafter, "**Non-ELP Warehouse Spreadsheet**") (*id.* at ¶ 6(f));

(c)  As to goods allegedly belonging to NVT Licenses, "Expeditors bills of lading and storage invoices from Expeditors' storage agent for Expeditors file ## 612624973, 612624974, and 612625229 (Bates ##EXPD007095 through EXPD00711); ***and data and calculations in Bates #EXP010445***," (*id.* at ¶ 6(g)) (emphasis added);

As discussed in the Welch Dec., however, the Defendants failed to produce the document referred to as EXP010445, which is one of the handful of documents that Defendants actually identified with specificity given its importance to Defendants' position. (*See* Welch Dec., at ¶¶ 3-8).  Because the Defendants failed to produce the documents during discovery, the Court should not consider it, which is damning to Defendants' ability to establish their alleged warehouse liens relative to NVT Licenses. *See U.S. v. GMI USA Corp.,* 774 F. Supp. 3d 645, 652 (S.D.N.Y. 2025); *see also John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp.2d 262, 269 n.4 (S.D.N.Y. 2014) (on motion for summary judgment, court may not consider documents not produced during discovery), *aff'd*, 882 F.3d 394 (2d Cir. 2018).

(d) "Expeditors' transaction files for shipments that Expeditors transported for the Payor-Debtors and for goods for which Expeditors provided warehouse and distribution services (or in the case of NVT Licenses, LLC, warehouse services) during the period from June 1, 2015, through June 30, 2016 (Bates ##EXPD010467 through

---

[14] There is no document produced by Defendants in this litigation with the Bates No. EXP010466.  Plaintiff presumes Expeditors is referring to an un-marked file titled "Warehouse inventory ELP raw data 2025-01-15 10466 unprotected.xlsx," which we understand to be a warehouse report for its El Paso based warehouse facilities. (Powell Tr.154:7-11, 4-25; 155: 2).

[15] There is no document produced by Defendants in this litigation with the Bates No. EXP010465.  Plaintiff presumes Expeditors is referring to an unmarked file titled "Warehouse inventory non-ELP raw data 2025-01-27 10465.xlsx", which we understand to be a warehouse report with respect to Expeditors' warehouse facilities outside of El Paso.  (Powell Tr. 163: 4-22).

57533/0006-52850461

EXPD0343354) [16] (collectively, the "**Transaction Files**"), which, as pertinent to Expeditors' alleged warehouse liens, purportedly include (1) "Expeditors' invoices and credit memos for the applicable transactions," and (2) documents evidencing value of the goods. (*Id.* at ¶ 8(a) and 8(b)).

The ELP Warehouse Spreadsheet and the Non-ELP Warehouse Spreadsheet are the core documents upon which Defendants' warehouse lien analysis is based, but those documents are of limited utility. According to the Hamman Declaration, the spreadsheets show "the items of goods that the Payor-Debtors stored with Expeditors during the period June 1, 2015, to June 30, 2016, the date on which Expeditors received each item at its warehouse, and the date on which Expeditors released possession of the goods at Expeditors' warehouse." (Hamman Dec. at ¶¶ 8(e)-(f)). But as Defendants admit, those spreadsheets do not indicate the owner or the value of the referenced inventory. (*See* Powell Tr., 177:5-181:7). Although the spreadsheet contains references to client numbers and entity codes (*see* Canale Dec at ¶¶ 33, 40), that information is not indicative of the ownership of the collateral, but is just the client number in Expeditors' system. (*See* Powell Tr., 177:5-181:7). What those documents do demonstrate, according to the Defendants, is how much inventory was on hand on a particular date. (*See id.*). Further, based on our review, the data in the spreadsheets is limited to the period from September 2, 2015 to April 29, 2016, not June 1, 2015 to June 30, 2016, as Hamman asserts. (*See* Canale Dec. at ¶¶ 29-30, 37).

To ascribe ownership of the goods Expeditors is storing or transporting, Expeditors concedes that it must rely wholly upon SunEdison correspondence and/or Customs documents (to the extent available) (Powell Tr. 116:15-118:7). Moreover, as an operational matter, Expeditors admits that it does not necessarily need to know whose goods they are storing or transporting and does not always record that information. (Powell Tr. at 127:14-128:2). However, Expeditors has

---

[16] *The referenced bates range consists of 172,168 documents, which is in excess of 300,000 pages.*

28

the burden to establish, beyond any genuine issue of fact, that the estates of the relevant Payor-Debtors against which they assert secured claims owned the alleged collateral forming the basis of their alleged liens.  Despite their burden, Defendants have failed to identify any of the correspondence and/or Customs documents that they admit are needed to substantiate their allocation of ownership of collateral to the various Payor-Debtors.  Moreover, as set forth in the Canale Dec., after a painstaking review, Plaintiff has discovered significant discrepancies in Defendants' own files regarding their ownership allocation, as well as allocations that contradict the relevant SunEdison correspondence regarding ownership, all which demonstrate material factual disputes that make this matter unfit for summary judgment.  (*See* Canale Dec. at ¶¶ 32-43).

In addition, as set forth in the Canale Dec., the ELP and Non-ELP Warehouse Spreadsheets lack sufficient detail to tie entries to shipping records, contain no pricing mapped to SKUs, and include no inventory reports that reconcile on-hand beginning and ending quantities by SKU. (*See e.g.*, Canale Dec. at ¶¶ 25-26, 31-33, 35, 42).  According to Hamman, the ELP and Non-ELP Warehouse Spreadsheets were generated from Expeditors' warehouse management systems. (*See* Hamman Dec. at ¶8(e)).  However, Expeditors seemingly has not produced (and certainly has not identified with specificity) the underlying documents and data needed for Plaintiff to verify the alleged "on hand" inventory amounts reflected in the ELP Warehouse Spreadsheet and Non-ELP Warehouse Spreadsheet.  (*See* Canale Dec. at ¶¶ 25, 40-42).  The "on-hand" inventory count of any item is the product of the beginning and ending quantities of that item any particular date. That information ought to be reflected in warehouse receipts and inventory reports reflecting on-hand beginning and ending inventory quantities by SKU.  But Expeditors has either failed to produce or identify these critical documents in its Motion.  As a result, Plaintiff cannot verify the alleged quantity of inventory allegedly stored in Expeditors' warehouse and, consequently, also

cannot verify the value of each SKU of inventory (which is product of the quantity multiplied by the market price). Accordingly, there are material factual disputes relating to the ownership, quantity, and value of Defendants' alleged Warehouse Collateral coverage, rendering these issues unfit for summary judgment.

### C. Defendants' Cannot Establish Their Asserted Carriers' Liens.

#### 1. Defendants Lack Replacement Liens Against NVT Licenses and SPS.

Similar to a warehouse lien, a carrier's lien is a statutory lien arising under the applicable state law's adaptation of UCC § 7-307[17] or, with respect to maritime transactions,[18] under federal maritime law. It is a possessory lien, which means it only applies to goods in possession of the carrier. *See* UCC § 7-307(e) ("A carrier loses its lien on any goods that it voluntarily delivers or unjustifiably refuses to deliver").

Unlike the warehouse lien statute (UCC § 7-209), however, the carrier's lien statute (UCC § 7-307) does not permit general liens. The Official Comments state, in pertinent part:

> because carriers do not commonly claim a lien for charges in relation to other goods or lend money on the security of goods in their hands, ***provisions for a general lien or a security interest similar to those in Section 7-209(a) and (b) are omitted***. Carriers may utilize Article 9 to obtain a security interest and become a secured party….

---

[17] Section 7-307(a) of the UCC provides, in pertinent part, that "[a] carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."

[18] The Maritime Lien Act automatically gives rise to a maritime lien when a person furnishes necessaries to a vessel on the order of the owner or a person authorized by the owner, and neither intent nor consent is involved in its formation. 46 U.S.C. § 31342(a)(1).

57533/0006-52850461

UCC § 7-307, Official Comment at ¶ 1 (emphasis added).  Thus, although a carrier is not entitled to a statutory general lien, a carrier may enter into a security agreement for a general lien under Article 9 of the UCC.  Under Article 9, "a security interest attaches to collateral when it becomes enforceable against the debtor," UCC § 9-203(a), and it is enforceable against the debtor if "the collateral is … in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement." UCC § 9-203(b)(3)(B).   A "security agreement," in turn, means "an agreement that creates or provides for a security interest." UCC § 9-102.

Expeditors concedes, as it must, that NVT Licenses and SPS never signed any of the contracts with Expeditors. However, they contend that those Payor-Debtors nevertheless conveyed Article 9 replacement liens to Expeditors as result of their course of performance and course of dealing with Expeditors.  (*See* Motion at pp. 23-25).  However, Expeditors made the exact same argument in *Expeditors Int'l of Washington, Inc. v. The Off. Creditors Comm. of CFLC, Inc. (In re CFLC, Inc.)*, 166 F.3d 1012 (9th Cir. 1999), which was rejected by the Ninth Circuit for reasons that are equally applicable here.

In *CFLC*, Expeditors provided freight forwarding, ocean shipping and customs brokerage services to the debtor.  Over the course of 17 months, Expeditors sent the debtor about 330 invoices.  The invoices contained certain terms and conditions of service in fine print, including a general lien provision. *See CFLC*, 166 F.3d at 1014.  Although the debtor never objected to the invoice terms prior to its bankruptcy, the debtor also "never signed the invoices or any agreement with Expeditors regarding the printed invoice terms." *Id.* After the debtor filed in bankruptcy, Expeditors sought a declaration that it held valid replacement liens against the debtor's assets, arguing, among other things, that the debtor's receipt of its invoices, without objection, and course of dealing created an enforceable security interest. *See id.* at 1015-16.

31

The Ninth Circuit affirmed the lower court's rejection of this argument, holding that "Expeditors' pre-printed invoice terms did not create a security interest in [the debtor's] property, either explicitly or through course of dealing analysis under Article 2 or Article 9 of the Uniform Commercial Code." *Id.* at 1014.  The court held that UCC Article 2 was inapplicable because Expeditors provided services, not goods.  *Id.* Turning to UCC Article 9, the court explained that "[c]ourse of dealing evidence may supplement the agreement by providing evidence of the parties' intentions, but it should not be used to create an agreement."  *Id.* at 1017.  The court also found that "the general lien asserted by Expeditors is not automatically provided by the U.C.C. and is not inherent to a shipping contract." *Id.* at 1018.  The court stressed, among other facts, that the parties never actually discussed the general lien provision in the invoices, and given that the debtor never signed any of the documents, the court was unconvinced there was a security agreement.  The then court concluded that "no Article 9 security interest was created because the mere sending of pre-printed invoices is insufficient either to establish the mutual intent necessary to create a security interest or to require the application of course of dealing analysis."  *Id.* at 1019.

As in *CFLC*, Expeditors alleges here that: (i) NVT Licenses and SPS engaged in numerous transactions with Expeditors, "where Expeditors' replacement lien provisions were contained in the LSA, Expeditors' transportation documents, and Expeditors' invoices," (Defs. Statement of Facts at ¶ 9), without objection.; and (ii) that such transactions "established a common basis of understanding that the replacement lien applied to their transactions." (Motion at p. 25).  However, NVT Licenses and SPS never signed any of the documents, and Expeditors has presented no evidence that general lien provisions in the documents that those Debtors never signed were specifically discussed and agreed to.  Accordingly, Expeditors' course of dealing argument fails as a matter of law.  At a minimum, genuine disputes of material fact exist as to whether NVT

32

57533/0006-52850461

Licenses and SPS formed a security agreement with Expeditors granting Expeditors a general Article 9 lien against their assets.

Furthermore, as with the warehouse liens, given that the Payor-Debtors operated on credit terms, it is extremely doubtful that Defendants maintained any specific carriers' liens against NVT Licenses or SPS as of the Petition Date (or even as of the transfer date). The goods at issue would have been delivered long before their transit was preferentially paid for by the Payor-Debtor. Certainly, the Motion lacks evidentiary support to substantiate specific carrier's liens.

> **2.      Genuine Material Issues of Fact Exist Regarding Ownership and Value of the Alleged In-Transit Collateral.**

Defendants' In-transit Collateral analysis suffers from the same flaws and deficiencies as their Warehouse Collateral analysis. According to the Hamman Declaration, Defendants' "In-Transit Collateral" coverage position is derived from the following documents:

(a) the Transaction Files (which, as discussed above, span over 100,000 documents), including Expeditors invoices and commercial invoices (where available) to establish value, (Hamman Dec. at ¶¶ 8(a)-(b));

(b) "The back side of the Expeditors bill of lading or waybill in connection with a transportation transaction file," (*id.* at ¶ 8(c));

In paragraph 8(c)(2) and (c)(3), Hamman relies upon and refers to "Expeditors' air waybill terms and conditions for shipments transported in whole or in part by air (Bates ##EXPD0343374 through EXPD0343378)" and "Expeditors' service conditions (Bates ##EXPD0343379 through EXPD0343389) and North American domestic contract of carriage (Bates ##EXP0343390 through EXPD0343394), each for shipments transported by truck." However, none of the referenced Bates labeled documents were produced to the Plaintiff during discovery. (*See* Welch Dec. at ¶¶ 3-8). Therefore, the Court should not consider them. *See supra, at* p. 27. The absence of these documents creates genuine issues of material fact regarding Defendants' asserted carrier's liens.

(c) "The event codes from Expeditors' transportation systems," which allegedly show "the date on which Expediters received possession of the goods at the origin location" and "the date on which Expeditors delivered the goods at the destination location" for each shipment transaction, (*id.* at ¶ 8(d)).

33

Based on these documents, Defendants allege that they possessed $1,899,622,87 worth of collateral belonging to SUNE as of the Petition Date. Defendants do not allege they possessed any other In-Transit Collateral as of the Petition Date, but rather inconsistently allege In-Transit Collateral coverage for most of the other Debtors on the various transfer dates. As to SUNE, Defendants' Lien Defense is based only on alleged In-Transit Collateral (*i.e.*, Defendants do not allege any Warehouse Collateral for SUNE); the same is true for Solaicx and MEMC Pasadena.

As discussed above, Defendants' "In-Transit Collateral" analysis is systemically flawed with respect to the ownership issue. Defendants' analysis is premised on their contention that, under the relevant documents, each of "the shipper, consignor, and consignee" is liable for the freight charges. (*See* Motion at p.p. 18-19). Based on this contention, Defendants advantageously assigned "in-transit" collateral to either the consignee, seller, or shipper (of their choosing) involved in the relevant freight transaction. (*See* Hamman Dec. at ¶ 6(c) ("The 'In-Transit Collateral' identified in the Collateral Coverage Chart is the goods for which Expeditors provided transportations services where the applicable Payor-Debor was either shipper, consignee, or seller") and Ex. A (column entitled "Criterion used for including in-transit collateral")). Likewise, Defendants unabashedly assigned "In-Transit Collateral" allegedly owned by SUNE to cover NVT Licenses' transfers based on SUNE's guarantee of the debts.

However, Defendants' "in-transit" lien analysis is based on the wrong metric: liability instead of ownership. A party's alleged liability with respect to any particular freight transaction is *immaterial* to the analysis. Defendants' lien analysis ought to demonstrate, among other things, the extent of their alleged possessory liens on each Payor-Debtor's goods, not whether a Payor-Debtor was liable with respect to a freight transaction. In other words, while all parties involved in a freight transaction may potentially be liable to pay Expeditors, that does not mean that all of

34

those parties simultaneously own the goods being transported.  But in some instances that is exactly what Defendants' In-Transit collateral allocation states. (*See* Canale Dec. at ¶ 18 (explaining how the inconsistent criteria used in the Hamman Declaration appears to have caused the same in-transit inventory to be assigned to two different Payor-Debtors)).  The issue of ownership of the transported goods is entirely separate from the question of liability with respect the freight transaction, and the owner of the goods need not be any of the shipper, consignee, or consignor.

Defendants' varying shipper, consignee, or consignor allocation of alleged collateral to the Payor-Debtors does not appear arbitrary, either.  As demonstrated in the Canale Dec., if, for example, the In-Transit Collateral attributed to SUNE based on it being the "shipper" is reassigned to the "consignee" in those transactions, the collateral would shift to other entities (almost all of which are not even Debtors), leaving SUNE under-secured by approximately $1,219,759.  (*See* Canale Dec. at ¶ 16).  In addition, Defendants' In-Transit Collateral position is contradicted by the Debtors' own records.  With respect to SUNE, for example, its Schedules of Assets and Liabilities [Docket No. 821] reflects that SUNE did not own any inventory as of the Petition Date.  (*Id.,* at ¶ 17).  Further, as reflected in the Canale Dec., based on our review of the relevant shipping documents and invoices, the Plaintiff has been unable to verify $353,752.00 of alleged In-Transit collateral value.  (*See id.* at ¶¶ 20-22).  Accordingly, there are material factual disputes relating to the ownership and value of Defendants' alleged In-Transit Collateral coverage, which makes this matter unripe for summary judgment.

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendants' motion for summary judgment should be denied in its entirety, and Plaintiff's cross-motion for summary judgment as to the Defendants' Time-Bar Defense should be granted.

35

Dated: New York, New York
      April 17, 2026

                                         **COLE SCHOTZ P.C.**

                                         */s/ Mark Tsukerman*
                                         Daniel F. X. Geoghan
                                         Cameron A. Welch
                                         Mark Tsukerman
                                         Arielle H. Wasserman
                                         1325 Avenue of the Americas, 19th Floor
                                         New York, New York 10019
                                         Telephone: (212) 752-8000

                                         *Counsel to Drivetrain, LLC, in its capacity*
                                         *as Trustee of the SunEdison Litigation Trust*

36

57533/0006-52850461